411 A.2d 810

**COMMONWEALTH of Pennsylvania**

**v.**

**Alphonse John PRITCHARD, Appellant.**

Superior Court of Pennsylvania.

Argued July 9, 1979.

Filed Oct. 12, 1979.

Petition for Allowance of Appeal Denied Feb. 25, 1980.

James P. Gannon, Media, for appellant.

Michael F. X. Coll, Assistant District Attorney, Media, for Commonwealth, appellee.

Before WIEAND, NIX and WEKSELMAN, JJ.*

NIX, Judge:

This is an appeal from judgments of sentence entered upon jury verdicts finding appellant guilty of first degree murder, criminal conspiracy and possession of a prohibited offensive weapon. The facts are as follows:

The victim, Frank Sawyer, was killed in a house in Media, occupied by Thomas Bruton, a co-defendant, on the night of August 12, 1976. Sawyer's wife Sara Sawyer, another co-defendant, had taken out an $8,000 insurance policy upon the life of her husband 3 months before the killing, providing for double payment in the case of accident or violent death. Two months before the killing she left her husband and moved in with Susan Huber, Bruton's girlfriend. From the date of this separation, Mrs. Sawyer and appellant were lovers.

* Justice ROBERT N. C. NIX, Jr. of the Supreme Court of Pennsylvania, and Judge I. MARTIN WEKSELMAN of the Court of Common Pleas of Allegheny County, Pennsylvania are sitting by designation.

The victim often badgered Mrs. Sawyer and she explained her difficulties to Bruton and indicated to Bruton that she would be better off if her husband wasn't around. Bruton indicated to her that he could have her husband killed professionally for $5,000 and that he would put up the money in advance to be repaid from the insurance proceeds. The insurance policy expired on August 12, the day of the killing. Appellant gave Mrs. Sawyer the money to pay the last premium on the policy.

Bruton told appellant of Mrs. Sawyer's troubles and desire to be rid of her husband. He also told appellant that arrangements had been made to kill the victim. Appellant often asked Bruton when the killing would occur, and sometime in July, appellant told Bruton that if the victim wasn't killed soon he would do it himself. On one occasion appellant asked Bruton for a gun so he could kill the victim immediately.

One day in late July or early August of 1976, the victim was working underneath his car when it slid off its jack and landed on the victim. At the time appellant was supposedly working on the side of the vehicle. The victim sought medical attention at a hospital, where he remained until August 11. On August 11, Mrs. Sawyer visited him and learned that he would be discharged on the 11th or 12th.

Appellant called the hospital on the 11th to learn whether the victim had been discharged. On the 12th Mrs. Sawyer told appellant that the victim would be at Bruton's house that night. On the night of the 12th, the victim went to the house in Media. Appellant was already present, and the two of them went down into the basement where they watched Bruton work on fishing equipment. As the victim was watching Bruton, appellant struck the victim's head twice with a hatchet. Appellant then tried to strangle the victim with some thin electrical cord. When this cord broke, he used some heavier cord. Bruton moved the victim's car from in front of the house and upon his return found the victim dead. Bruton untied the cord and laid the victim on his back, placing a plastic bag under his head to keep blood

off the floor. He then cleaned up the area with a broom and water.

Appellant telephoned Mrs. Sawyer. Then Bruton's girl-friend Susan Huber, arrived, and Bruton told her of the killing. Mrs. Sawyer then arrived. The two women went back to the apartment they shared, and appellant and Bruton put the victim's body in a car, drove it to Delaware, and left the body alongside a rural road. The victim's car was then driven to a hotel parking lot and parked among rental cars.

On the Saturday following the killing, appellant stated in the presence of Mrs. Sawyer and Ms. Huber that this was the first time he had killed someone without being paid to do so.

■ Appellant first asserts that the trial court erred in not sustaining appellant's demurrer to the charge of criminal conspiracy. As appellee correctly notes, because appellant did not rest following the trial court's refusal to sustain his demurrer, the correctness of that refusal is not properly before this Court. *Commonwealth v. Ilgenfritz,* 466 Pa. 345, 347 n. 8, 353 A.2d 387 (1976). In this posture the question to be considered is the sufficiency of the evidence. *Commonwealth v. Warren,* 475 Pa. 31, 34 n. 2, 379 A.2d 561, 562 n. 2 (1977); *Commonwealth v. Perdie,* 249 Pa.Super. 406, 411 n. 6, 412, 378 A.2d 359, 361 n. 6 (1977), *allocatur denied.*

■ According the Commonwealth the traditional deference due to the verdict winner, *see Commonwealth v. Williams,* 476 Pa. 557, 560, 383 A.2d 503, 505 (1978), and recognizing that criminal conspiracy may be established by attendant circumstances and conduct of the parties, *Commonwealth v. Sadusky,* 484 Pa. 388, 393, 399 A.2d 347, 349 (1978); *Commonwealth v. Perdie, supra,* we find that the testimony supports adequately the verdict of guilt on the criminal conspiracy charge. *See Commonwealth v. Roux,* 465 Pa. 482, 350 A.2d 867 (1976).

■ Appellant's second contention is that the trial court erred in permitting two Pennsylvania state troopers to testi-

fy that after appellant had been arrested and given the *Miranda*[1] warnings he denied knowing the victim or anything about the killing. Appellant reasons that this testimony was aimed at impeaching his credibility, and since the testimony was admitted in the prosecution's case-in-chief, before appellant testified, his credibility was not yet in issue, and the testimony was irrelevant. We disagree. At the time the Commonwealth put on this testimony, it had already presented abundant evidence showing that appellant did know the victim. Therefore, the false or contradictory statement of appellant denying knowledge of the victim was admissible as substantive evidence of consciousness of guilt. *Commonwealth v. Cristina*, 481 Pa. 44, 52–53, 391 A.2d 1307, 1311–12 (1978). Given the foundation laid by the prosecution prior to introducing the trooper's testimony, such testimony was highly relevant.

■ The circumstances surrounding appellant's third assignment of error require some explanation in order to understand fully appellant's complaint. The trial court had entered a pre-trial order requiring the Commonwealth to provide the defense with all reports of analysis performed by the prosecution on physical evidence and to provide access to such evidence to allow the defense to conduct its own analysis. During police investigation of the crime, a serologist, acting on behalf of the police, conducted a laboratory test for the presence of blood on a sample of carpet taken from the crime scene. The test proved negative, and the written report given to defense counsel before trial in accordance with the pre-trial order stated that the laboratory test yielded negative results. When this same serologist testified at trial, he stated that a field test, i. e., one performed by him at the crime scene, had indicated "presumptive evidence" of blood; he testified further that water dilution could have eliminated traces of blood thus resulting in negative laboratory results.

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Appellant's arguments of error stem from the fact that the written report of the laboratory test nowhere informed appellant that a field test yielding positive results had been conducted. Appellant claims that the belated discovery of the positive field test hampered cross-examination of the serologist. Although in theory, unexpected expert testimony may have that effect, our review of the transcript shows that the serologist was vigorously cross-examined as to both the field test and the laboratory test. Appellant also argues that his pre-trial ignorance of the presumptively positive field test results led him to rely upon the negative laboratory results disclosed by the Commonwealth rather than retaining his own defense expert. Assuming that appellant would have retained his own expert had he known of the field test results, we fail to see how appellant was prejudiced. Undoubtedly, the purpose of retaining an expert would be to challenge the field test's positive results, presumably by a laboratory finding of negative results. In this case, the Commonwealth's own laboratory test provided the negative results that appellant would have sought via his own expert; these laboratory results were disclosed to appellant pre-trial and were received into evidence at trial. Appellant has exaggerated the effect of the belated disclosure of the field test results. Finally, appellant himself concedes that *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) does not compel a contrary conclusion, because the field test results were not exculpatory. Thus, the trial court's denial of appellant's motion for mistrial was not error.

■ Appellant next asserts that the trial court erred in refusing to admit certain evidence offered by defense counsel aimed at showing that a prosecution witness, Thomas Bruton, had a reputation for being "terrible", thus rebutting the witness's testimony that he feared appellant. The evidence offered consisted of two photographs of Bruton's fishing equipment, which bore the logo "Terrible Tom". Because the meaning of these words was ambiguous (they could refer to Tom's prowess as a fisherman or to his

personality), we conclude that under the traditional test for relevancy, *see Commonwealth v. Davenport,* 462 Pa. 543, 555, 342 A.2d 67, 73 (1975), the trial court did not err in excluding the photographs.

■ Appellant's final contention is that the trial court erred when it refused to allow defense counsel on cross-examination of Bruton to ask him if he had ever told anyone he was a contract killer. The case of *Commonwealth v. Greene,* 445 Pa. 228, 285 A.2d 865 (1971), held that defense counsel was precluded from asking a witness a question knowing that the witness would invoke the fifth amendment's privilege against self-incrimination. Regardless of our view of the soundness of that decision *see Id.,* 445 Pa. at 232, 285 A.2d at 867 (Roberts, J., joined by O'Brien, J., dissenting), *Greene* controls, and the issue must be resolved against appellant.

Affirmed.