STATE OF MINNESOTA

IN SUPREME COURT

C5-02-2108
A04-0875

St. Louis County                                                    Lillehaug, J.
                                                       Took no part, Hudson, J.

State of Minnesota,

            Respondent,

vs.                                                        Filed:  March 2, 2016
                                                       Office of Appellate Courts
Vidale Lee Whitson,

            Appellant,

Vidale Lee Whitson,

            Appellant,

vs.

State of Minnesota,

            Respondent.
                         _____

Vidale Lee Whitson, pro se, Bayport, Minnesota, for appellant.

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

Mark S. Rubin, St. Louis County Attorney, Gary W. Bjorkland, Assistant St. Louis
County Attorney, Duluth, Minnesota, for respondent.
                         _____

1

1.      Without deciding whether the prosecutor committed misconduct by failing to adequately prepare a witness and eliciting inadmissible testimony, the alleged misconduct was harmless beyond a reasonable doubt.

2.      The postconviction court did not abuse its discretion in denying appellant's postconviction claims of ineffective assistance of trial counsel without granting an evidentiary hearing.

3.      The State did not fail to disclose material exculpatory evidence to the defense.

4.      The postconviction court did not abuse its discretion in denying appellant's claims that the police and prosecutors fabricated evidence without granting an evidentiary hearing.

5.      Omissions from the trial transcript that were later corrected and provided to appellant did not deny him the right to meaningful review of his conviction.

Affirmed.

O P I N I O N

LILLEHAUG, Justice.

Appellant Vidale Lee Whitson was convicted of first-degree felony murder for the killing of Milton Williams and attempted first-degree premeditated murder for the shooting of T.C.  In this consolidated direct appeal and appeal from the denial of postconviction relief, Whitson alleges five grounds for relief.  We affirm.

I.

*The Crime and Investigation*

On the evening of April 24, 2001, the Duluth 911 Center received an emergency call from a woman, T.C., pleading for help. T.C. reported that she had been shot, that another person in the apartment was dead, and that the man who had shot them was no longer in the apartment. During the call, T.C.'s upstairs neighbor A.B., who had heard the gunshots, entered the apartment to investigate. A.B. took the phone from T.C. and told the operator that he had witnessed three black men leave through the back door of the apartment and drive off in a car with Minnesota plate number 650 PYT.

When police arrived at the apartment, they found a man lying face down in a pool of blood in the kitchen and T.C. sitting on the floor with blood on her face and hands. The man, Milton Williams, had been shot three times in the legs and once in the head. T.C. had been shot once in the left cheek, causing major injuries to her face, jaw, neck, and vocal cords. When asked three times by responding officers who had shot her, she answered "Tyrone White," then "Tyrone," and finally "Tyrone White and his friend." T.C. survived, but Williams was pronounced dead at the hospital.

Information identifying the vehicle carrying the suspects was broadcast to law enforcement, and almost immediately a Duluth police officer observed a car matching the description travelling southbound on Interstate 35. The officer began to pursue the car, confirmed that its license plate matched the one given by A.B., and followed until the car came to a stop in a gas station parking lot. Inside the car were three men and a woman. The driver was Tyrone White, the front-seat passenger was Ben King, the passenger seated

3

behind the driver was Charlessetta Jackson, and seated on the rear passenger's side was appellant Vidale Whitson. When the occupants left the car, White was wearing a floral-patterned shirt, King was wearing a gray and white striped shirt, and Whitson was wearing an orange plaid shirt. Upon searching the vehicle, the police found a plastic bag containing cocaine and another bag containing $2,915.

On August 20, 2001, Whitson was indicted on three counts: the first-degree premeditated murder of Milton Williams, Minn. Stat. § 609.185(1) (2000), the first-degree murder of Milton Williams during an aggravated robbery, Minn. Stat. § 609.185(3), and the attempted first-degree premeditated murder of T.C., Minn. Stat. §§ 609.185(1), .17 (2000). All three offenses were charged on an accomplice-liability theory. Whitson's attorney made motions in limine seeking, among other things, to exclude evidence that Ben King and his girlfriend J.M. had been threatened in an attempt to keep King from testifying to the events of April 24. The court granted Whitson's motion to exclude any evidence of threats against witnesses.

At trial, the State argued that Whitson was the sole gunman and fired the shots that killed Williams and injured T.C. Whitson's defense was that Ben King shot Williams and T.C. and that Whitson did nothing to aid in the commission of the crimes. Because forensic evidence could not establish the identity of the gunman,[1] the State's case that Whitson was

---

[1]     Traces of blood were found on the clothing of all three men. Although the most blood was found on Ben King, blood was also found on a glove Whitson had in his pocket. No identifiable fingerprints were found on the discarded gun used in the crime.

4

the shooter centered on the testimony of two eyewitnesses: T.C. and Ben King. Whitson did not testify at the trial.

### *T.C.'s Testimony*

T.C. testified that, on the day of the crime, she received a telephone call from Tyrone White, who was calling from somewhere in the Twin Cities. White asked her if he could spend the night at her apartment in Duluth. T.C. responded that he could not stay with her because Williams was there, but that he could stop by. Between 6:00 and 6:30 that evening, White arrived at the apartment, accompanied by a man T.C. knew as "Big Time" (Ben King's nickname), and a man wearing a plaid shirt whom she did not recognize. While King and the man in the plaid shirt sat in the living room, White entered the kitchen and began talking with T.C., Williams, and two other women.

Shortly thereafter, the two other women left the apartment. White and Williams began arguing over a $50 debt that White supposedly owed Williams. During the argument, White looked into the living room and nodded. King and the man in the plaid shirt then entered the kitchen. The man in plaid shot Williams, first in the legs and then in the head. T.C. began to plead for her life. She watched as one of the men reached into Williams' pockets and pulled out some objects. T.C. then felt "a burning sensation" on her face and fell to the ground. She had been shot. Though she did not see who shot her, T.C. testified that only the man in the plaid shirt had a gun. T.C. further testified that she initially identified "Tyrone White" as the shooter because, of the three, she knew only his name and wanted to ensure that police could catch her attackers.

5

***Ben King's Testimony***

When King was arrested on April 24, he initially told police that he did not know anything about what happened in T.C.'s apartment. However, 2 days later he contacted police and indicated that he wanted to talk about the crime. Ultimately he reached an agreement with the State to plead guilty to aiding an offender after the fact. As part of the plea, King agreed to testify at Whitson's trial, and he and the State agreed to recommend that King would be sentenced to 150 months in prison.

At Whitson's trial, King testified that, on the day of the crime, White, Whitson, and another man named Doug had been talking and drinking beer in Minneapolis when White suggested traveling to Duluth to rob a man whom he thought had a lot of money. White suggested that he could start an argument with the man over a $50 debt as a pretext for robbing him. White then noted that it would not be easy to rob the man, and told Whitson he may have to use "the thing" on the man. King took this to be a reference to a gun. King testified that Whitson responded: "[Y]ou shouldn't be able to hear a .22 inside of a house."

King then borrowed a gun from Doug and stowed it in the back pocket of the driver's seat in Charlessetta Jackson's car. White used King's cell phone to call T.C. to make sure that the man they planned to rob would be at her apartment. White, King, Whitson, and Jackson then drove to Duluth in Jackson's car. When the four arrived at T.C.'s apartment, White instructed Jackson to park the car facing outward and to leave the engine running.

White, King, and Whitson then entered the apartment and sat in the living room. White went into the kitchen and joined T.C. and Williams. White began to argue with Williams, at which point King started to leave the apartment because he wanted a cigarette

6

and did not want to be there when Whitson robbed Williams. But, before King could leave, he heard gunshots and turned to see Whitson standing in the doorway between the living room and the kitchen, holding the gun. As Williams staggered, Whitson shot Williams in the top of the head. Whitson then told King to take Williams' pants off. But the pants would not come off, so King searched Williams' pockets and removed two plastic bags, one containing money and the other containing what King believed to be drugs. T.C. was on her knees, crying and pleading for her life. Whitson shot her.

King, White, and Whitson ran out of the apartment and fled the scene in the waiting car. Whitson told King to give him the money he had taken from Williams. King passed the money and drugs to Whitson, at which point they noticed a police car turn around on the highway and begin to pursue them. White, who was driving, tried to elude the police. At King's instruction, Whitson threw the gun out the window. Shortly thereafter, White stopped the car in a gas station parking lot where they were arrested.

On cross-examination, Whitson's defense attorney aggressively challenged King's credibility. He emphasized inconsistencies among King's trial testimony, grand jury testimony, and statements to police. On redirect, the prosecutor attempted to rehabilitate King's credibility. The following exchange occurred.

> Q: Yesterday during cross-examination you admitted . . . the details about White saying that – to Whitson, this is in Minneapolis, "You may have to use the thing," meaning the gun, and Whitson replying, "you probably won't be able to hear a .22 inside a house," but you left that out of any statements given to authorities or anybody else until August 2 of this year, is that right?
> A: Yes.
> Q: Why did you leave that out until all the way to August of this year?

A:     Because I was scared, and, plus, I've been getting threats on my family –

Whitson's attorney immediately objected, and the court sustained the objection.

Without the jury present, Whitson's attorney moved for a mistrial based on the introduction of "highly prejudicial and inflammatory" evidence of threats specifically excluded by the pretrial ruling. The prosecutor responded that he was attempting to elicit testimony that King was reluctant to provide information because he was scared for his personal protection, but that "the part about the threats I did not expect and did not attempt to solicit."

The court observed that "if you get into fear with this witness, the fact that there may have been threats . . . it is logical to expect this response." The court asked whether the prosecutor had told King not to testify about the threats. The prosecutor responded that he had not, and had only warned King not to make any reference to knowing Whitson from their time in jail together.

The court did not rule on whether the prosecutor had committed misconduct by failing to prepare the witness and eliciting the testimony. It denied the mistrial motion, but decided to issue a curative instruction. The court instructed the jury:

> [T]he last answer by Mr. King is stricken and the jury is specifically instructed to [dis]regard witness King's testimony about being scared and threats. The prosecution and the defense stipulate that Mr. Whitson has made no threats to anyone about this case or otherwise and no one has made any threats on his behalf.

8

***The Verdict and Post-trial Proceedings***

The jury found Whitson guilty of the first-degree murder of Milton Williams committed during an aggravated robbery and the first-degree attempted premeditated murder of T.C., but acquitted him of the first-degree premeditated murder of Williams. The court sentenced Whitson to life in prison for the murder and a consecutive 180-month term for the attempted murder.

In December 2002 Whitson filed a notice of appeal. In September 2003 we granted his motion to stay the appeal so he could pursue postconviction relief. Whitson's postconviction petition alleged five grounds for relief, and requested a new trial or an evidentiary hearing on his claims. The district court denied Whitson's petition without granting an evidentiary hearing.

In May 2004 Whitson appealed the denial of postconviction relief. We consolidated that appeal with his direct appeal. Whitson failed to pursue the appeal, and in April 2005 we dismissed it but stated that Whitson could move to reinstate the appeal. *See* Minn. R. Civ. App. P. 142.02. In January 2015 we granted Whitson's motion to reinstate the consolidated appeal.

Whitson now alleges the same five errors that he raised in his postconviction petition. He argues that he is entitled to a new trial because: (1) the prosecutor committed prejudicial misconduct by failing to adequately prepare a witness and eliciting inadmissible testimony; (2) his trial counsel was ineffective; (3) the State committed a *Brady* violation by withholding material exculpatory evidence; (4) the police and prosecutor fabricated evidence; and (5) errors and omissions in the transcripts of the trial and pre-trial hearings

9

violated his rights. Whitson also argues that the postconviction court erred by denying his petition without granting an evidentiary hearing.

## II.

At the threshold, we note that all of the issues Whitson raises on direct appeal were also raised and decided in his petition for postconviction relief. Accordingly, all of the issues in this case are subject to the standard of review applicable to an appeal from a denial of a petition for postconviction relief.

We review a postconviction court's decision to deny a petition, including its decision to deny the petition without granting an evidentiary hearing, for an abuse of discretion. *Quick v. State*, 757 N.W.2d 278, 281 (Minn. 2008). In determining whether the postconviction court abused its discretion, we review the court's factual findings for clear error and its legal conclusions de novo. *Williams v. State*, 869 N.W.2d 316, 318 (Minn. 2015). A postconviction court may deny a petition without a hearing only if the record, the facts alleged by the petitioner, and the parties' arguments conclusively show the petitioner is not entitled to relief. *Matakis v. State*, 862 N.W.2d 33, 37 (Minn. 2015); *see also* Minn. Stat. § 590.04, subd. 1 (2014). In making this determination, the postconviction court must consider the alleged facts in the light most favorable to the petitioner. *Matakis*, 862 N.W.2d at 37. However, a petitioner's allegations must be more than argumentative assertions without factual support. *Id.*

## III.

Whitson first argues that the prosecutor committed prejudicial misconduct by failing to adequately prepare Ben King to testify and eliciting inadmissible testimony from him.

10

Where such misconduct is alleged, the standard of review depends on whether the defendant objected at trial. If the defendant did not object, we apply a modified plain-error test. *State v. Mosley*, 853 N.W.2d 789, 801 (Minn. 2014) (citing *State v. Ramey*, 721 N.W.2d 294, 299-300 (Minn. 2006)). Where, as here, the defendant objected, we have used a two-tiered harmless-error test under which the standard of review varies based on the seriousness of the misconduct. *See State v. Steward*, 645 N.W.2d 115, 121 (Minn. 2002) (citing *State v. Caron*, 300 Minn. 123, 127, 218 N.W.2d 197, 200 (1974)). Under this test, "unusually serious" prosecutorial misconduct is reviewed to determine whether the misconduct was harmless beyond a reasonable doubt. *Id.* Here, even assuming without deciding that the prosecutor in this case committed misconduct requiring us to apply the most stringent standard of review,[2] we conclude that the alleged misconduct was harmless beyond a reasonable doubt.

Whitson argues that the prosecutor committed misconduct entitling him to a new trial when the prosecutor failed to adequately prepare Ben King to testify and elicited testimony that had been ruled inadmissible. Specifically, Whitson argues that the prosecutor did nothing to inform King prior to testifying that evidence regarding the threats sent to him and J.M. was inadmissible, and contends that the prosecutor's redirect question about why King's story had changed logically called for inadmissible testimony. Finally, Whitson argues that the prejudice caused by the jury hearing King's reference to the threats

---

[2]     Recent cases have questioned whether the two-tiered *Caron* standard for reviewing objected-to misconduct remains viable. *See, e.g.*, *State v. Carradine*, 812 N.W.2d 130, 146 (Minn. 2012); *State v. Nissalke*, 801 N.W.2d 82, 105 n.10 (Minn. 2011); *State v. McCray*, 753 N.W.2d 746, 754 n.2 (Minn. 2008). We need not resolve that issue in this case.

was not cured by the court's instruction. According to Whitson, the context in which King referred to the threats clearly implied that Whitson was their source, and the court's curative instruction—issued following a defense objection and a 4-hour delay in the presentation of evidence—actually served to focus attention on King's inadmissible testimony.

Prosecutorial misconduct is harmless beyond a reasonable doubt if the jury's verdict was "surely unattributable" to the misconduct. *State v. Nissalke*, 801 N.W.2d 82, 106 (Minn. 2011). Factors relevant to the determination of whether prosecutorial misconduct is harmless beyond a reasonable doubt include how the improper evidence was presented, whether the State emphasized it, whether it was highly persuasive, and whether the defendant countered it. *State v. Wren*, 738 N.W.2d 378, 394 (Minn. 2007). The strength of the other evidence supporting the verdict is also a factor in the analysis, but it is not dispositive. *Id.* Finally, the prejudicial effect of misconduct can be cured by proper instructions to the jury. *State v. Pendleton*, 706 N.W. 2d 500, 509 (Minn. 2005).

Here, the alleged misconduct was harmless beyond a reasonable doubt. First, the alleged misconduct was a single question. The prosecutor made no attempt to elicit the answer again after the defense objection was sustained and did not refer to the answer at any other point in the trial. *See State v. Wilford*, 408 N.W.2d 577, 580 (Minn. 1987) (concluding that, where questions regarding a witness's fear of testifying were brief and isolated, they were unlikely to have had a substantial impact on the verdict).

Further, the court's instructions to the jury adequately ameliorated the risk of prejudice. Not only did the court instruct the jury to disregard the witness's answer, but it

12

also affirmatively advised the jury that the parties had stipulated that Whitson had made *no threats* in connection with the case or otherwise, and that none had been made on his behalf. *See also id.* (concluding there was no prejudice where a curative instruction was given that included an explanation that the defendant had made no threats against the witness). We presume that jurors follow the trial court's instructions, *State v. Gatson*, 801 N.W.2d 134, 151 (Minn. 2011), and Whitson has not provided evidence or persuasive argument that the jury disregarded this instruction and the parties' stipulation.

Finally, though the strength of the other evidence against Whitson is only one factor in our harmless-error analysis, that factor also strongly supports the conclusion that any prosecutorial misconduct was harmless beyond a reasonable doubt. The inadmissible testimony consisted of only one answer in the course of an 11-day trial covering over 1,400 pages of transcript. Among other evidence, Ben King testified in detail to the planning of the crime and identified Whitson as the shooter. This testimony was corroborated by T.C., who testified that a man in a plaid shirt whom she did not know accompanied White and King to her apartment and shot her and Williams. White, King, and Whitson were apprehended together just minutes after the murder in a car with a plate number matching the number given by an eyewitness to the getaway. When the three emerged from the car, police saw that Whitson was clad in plaid. All of this is very strong evidence of guilt.

Because any misconduct allegedly committed by the prosecutor was harmless beyond a reasonable doubt, the postconviction court did not abuse its discretion in denying Whitson's petition for postconviction relief.

13

IV.

Whitson also argues that he is entitled to a new trial because his trial counsel was ineffective by (1) failing to review and introduce potentially exculpatory financial records; (2) negligently "sabotag[ing]" interviews with potential witnesses; (3) failing to challenge unconstitutional searches and seizures; (4) failing to accurately advise him of a plea offer; and (5) conceding Whitson's guilt during trial.

The Sixth Amendment to the U.S. Constitution guarantees the right to reasonably effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show that counsel was ineffective such that a new trial is required, Whitson must satisfy a two-pronged test: that counsel's representation fell below an objective standard of reasonableness, and that there was a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *State v. Taylor*, 869 N.W.2d 1, 21 (Minn. 2015). To receive an evidentiary hearing, a petitioner must allege facts that would, if proven, entitle him to relief under the two-pronged test. *See Leake v. State*, 737 N.W.2d 531, 536 (Minn. 2007). When reviewing an ineffective assistance claim, we strongly presume that counsel's performance was reasonable, *Andersen v. State*, 830 N.W.2d 1, 10 (Minn. 2013), and we need not address both prongs of the test if one is determinative, *State v. Rhodes*, 657 N.W.2d 823, 842 (Minn. 2003).

First, Whitson's petition alleged that his counsel was ineffective because counsel refused to review or introduce at trial certain unidentified financial records, which Whitson claimed would have rebutted the State's theory of the motive for the robbery. However, Whitson did not provide any specific information about the financial records or what these

14

records would show.[3]  Accordingly, Whitson has not alleged facts that, if proven, would demonstrate that counsel's failure to introduce the records was unreasonable or that introduction of the records could have led to a different result at trial.

Second, Whitson's petition alleged that his counsel was ineffective because counsel refused to interview potential witnesses a second time after "[counsel's] negligence sabotaged [the] first interview."  Typically, an attorney's decisions regarding which witnesses to interview constitute trial strategy that appellate courts will not second-guess. *State v. Davis*, 820 N.W.2d 525, 539 n.10 (Minn. 2012).  However, when counsel's conduct represents an inexplicable abandonment of investigation of a key point of the case, rather than "a course of action that trial counsel considered and rejected," such conduct does not amount to trial strategy.  *State v. Nicks*, 831 N.W.2d 493, 506-07 (Minn. 2013).  In this case, Whitson does not allege any facts about how counsel's performance was negligent, how counsel's actions led to the alleged failed interview attempts, what a second interview would have uncovered, or how new information would have led to a different result. Whitson's bare assertions do not show that he would be entitled to relief.

Third, Whitson argues that his counsel was ineffective by waiving challenges to search and seizure issues at the omnibus hearing.  Once again, Whitson provides no facts or argument as to why counsel's strategy was not objectively reasonable, and has not alleged any facts that, if proven, would have led to a different result at trial.

---

[3]     Whitson also claimed the records would have demonstrated that the police tampered with evidence by moving items around in the car he occupied prior to his arrest.  However, Whitson never explained how the financial records would support such a claim.

Fourth, Whitson alleges that counsel failed to accurately advise him of the consequences of a plea offer. The record does not reflect that any plea offer was made to Whitson, and Whitson provides no details about the supposed offer other than alleging that it was for a 20-year sentence. Further, Whitson does not provide any description of counsel's advice, why the advice was inaccurate, or when and why Whitson would have accepted the supposed offer.

Finally, Whitson alleges that counsel conceded his guilt at trial without first obtaining Whitson's consent. However, this allegation is not supported by the record. During closing argument, Whitson's counsel did state: "There's another crime, Aiding an Offender After the Fact that the [c]ourt told you about, and you have that instruction.[4] And [if] that's all you find he did, he is not guilty of the crimes that he's charged [with]." This statement cannot be construed as conceding Whitson's guilt to the uncharged offense, much less to the murder charges.

Because Whitson did not allege facts entitling him to an evidentiary hearing on any of these five ineffective assistance claims, the postconviction court did not abuse its discretion in denying his petition without a hearing.

V.

We now turn to Whitson's argument that the prosecution violated his right to due process by failing to disclose a police report that recounts an interview police conducted with T.C. 4 days after the shooting. T.C. responded to the officer's questions in writing

---

[4]    The relevant instruction told jurors that Whitson was not charged with that crime and could not be convicted of it.

16

because she was unable to speak due to her injuries and a breathing tube inserted into her airway. T.C. wrote: "I got shot by three assailants," followed by some illegible writing and the words "gray shirt." Whitson alleges this report was exculpatory and material because it identified someone as the shooter other than the man in the plaid shirt.

Under *Brady v. Maryland,* "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). But there was no *Brady* violation here. A careful review of the district court record reveals that this very report was disclosed to Whitson's defense counsel on May 25, 2001—over a year before Whitson's trial. Whitson's claim is therefore baseless.

## VI.

Whitson next argues that police and prosecutorial fabrication of evidence entitle him to a new trial and that, at the least, he should have had an evidentiary hearing. However, the sole instance of improper conduct specifically alleged is Whitson's assertion that "police officials tampered with evidentiary items in the vehicle by moving them to different locations." Whitson has not described with any particularity what items were moved, where they were moved, or the effect on the outcome of the trial. Whitson has simply failed to allege any facts that, if proved, would entitle him to a new trial. Accordingly, the postconviction court did not abuse its discretion in denying his petition without a hearing. *See* Minn. Stat. § 590.04, subd. 1.

## VII.

Finally, Whitson argues generally that the transcripts of his trial and pretrial proceedings are inaccurate and incomplete, and that such inaccuracy violates Minnesota law and the U.S. Constitution. However, Whitson's only specific allegation is that the trial testimony of two police officers is missing.

Complete and accurate transcripts are critical to a defendant's right to meaningful review of a conviction, though an incomplete transcript will not always impair this right. *See Hoagland v. State*, 518 N.W.2d 531, 535 (Minn. 1994); Minn. R. Civ. App. P. 110.03 (providing for reconstruction of the record in the event of an unavailable transcript). Only if an incomplete or erroneous transcript prevents a defendant from obtaining meaningful review may the defendant be entitled to a new trial. *Hoagland*, 518 N.W.2d at 535-36.

The transcript originally provided to Whitson was missing the testimony from 1 day of the trial. However, the missing testimony (including the testimony of the two officers) was provided to him in January 2015 following the reinstatement of this consolidated appeal. Accordingly, the relief Whitson seeks has already been provided. *See State v. Higgin*, 257 Minn. 46, 53, 99 N.W.2d 902, 907 (1959) (concluding that the failure to provide a transcript became a moot point once the transcript was provided). Thus, we have no basis to conclude that Whitson's right to a meaningful appeal has been impaired. Whitson is not entitled to a new trial on this claim.

VIII.

For the foregoing reasons, we affirm Whitson's convictions for first-degree murder and first-degree attempted murder.  We also affirm the postconviction court's summary denial of Whitson's petition for postconviction relief.

Affirmed.


HUDSON, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.