*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A21-0070**
**A21-0583**

State of Minnesota,
Respondent,

vs.

Larry Joe Foster,
Appellant.

**Filed January 8, 2024**
**Affirmed; motion denied**
**Larkin, Judge**

Hennepin County District Court
File Nos. 27-CR-19-22664, 27-CR-CV-20-48

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Adam E. Petras, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jenna Yauch-Erickson, Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Larkin, Presiding Judge; Frisch, Judge; and Halbrooks,

Judge.\*

---

\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**LARKIN**, Judge

Appellant challenges his conviction of second-degree murder, arguing that he is entitled to a new trial because (1) the district court violated his constitutional rights by prohibiting him from calling an alleged alternative perpetrator as a witness; (2) the state suppressed favorable, material evidence regarding the alternative perpetrator; (3) the state failed to make expert-witness disclosures; and (4) the prosecutor engaged in prejudicial misconduct. Appellant also argues that the cumulative effect of these errors deprived him of a fair trial, and he raises several issues in a pro se supplemental brief. We affirm.

## FACTS

On September 2, 2019, at around midnight, firefighters responded to a fire at Daniel Bradley's single-family home in Minneapolis. One of the firefighters found Bradley deceased in his living room with a laceration on his neck. The matter was investigated as a homicide, and respondent State of Minnesota ultimately charged appellant Larry Joe Foster with Bradley's murder.

Foster raised an alternative-perpetrator defense. Foster admitted that he was in Bradley's home when he was murdered, but he asserted that RJ killed Bradley. Foster subpoenaed RJ to appear as a witness at trial. Prior to trial, RJ appeared in district court with counsel and moved to quash the subpoena. RJ and his attorney informed the district court that RJ intended to invoke his Fifth Amendment right against self-incrimination. Foster argued that the invocation was "not ripe" because RJ had not been asked to provide testimonial evidence. Foster further argued that regardless of any possible invocation, he

had the right to call RJ to the stand as a witness so the jury could compare RJ's physical characteristics to descriptions and identifications provided by other witnesses. The district court opined that RJ was not required to invoke the Fifth Amendment in front of the jury and that the defense could not ask the jury to draw inferences from RJ's invocation, but the district court requested that the defense provide authority on those issues.

In a subsequent motion, Foster renewed his request to call RJ to the witness stand so RJ could invoke the Fifth Amendment in front of the jury. In the alternative, Foster requested a jury instruction informing the jury that RJ was unavailable to testify because he had invoked the Fifth Amendment. Following a hearing, the district court ruled that Foster could not call RJ to the stand for the sole purpose of having him invoke the Fifth Amendment in front of the jury. Foster argued that he should be allowed to call RJ so that the jury could observe his appearance and "gait" and compare RJ's manner of walking to that of individuals seen walking into Bradley's home on a surveillance video. The district court did not rule on that request. Instead, the district court said it would "have to see how everything plays out."

The matter proceeded to a jury trial. The state presented surveillance-video footage, which showed the driveway of Bradley's residence. An officer testified regarding the contents of that footage as follows. On the night of the fire, at 9:22 p.m., Foster's silver Ford truck passed Bradley's house. Three minutes later, the truck returned to Bradley's house, pulled up along the curb, and parked just out of the camera's view. At 9:36 p.m., an individual walked up to Bradley's home and entered. Two minutes later, the individual walked back to the truck. Soon after, one individual came out of the house and stood

3

outside. Another individual walked up to meet that person. At 9:40 p.m., the two individuals entered Bradley's house. The surveillance footage did not show anyone coming or going from Bradley's home from 9:40 p.m. until the arrival of the firefighters.

Bradley suffered extensive injuries, including a lacerated throat, stab wounds, and blunt-force injuries. The police described the crime scene as "very large" and "very complex." Officers found a significant amount of blood in the house, on the rear door to the house, on the exterior of the house, and in the backyard. Officers found two cell phones at the scene. One of the phones contained identifying information, an email address, which suggested that it belonged to Foster.

The room in which officers found Bradley's body contained evidence of a struggle. According to officer testimony, couches were flipped over, tables were broken, and "there was blood everywhere." There was "what looked . . . to be a downhill ski pole" with some metal on the top "that was consistent with [Bradley's] injuries . . . and there was blood on the ski pole." Officers also observed blood on a bent and broken walking stick, blood on two broken chair legs, blood on an overturned chair, and blood on a set of jumper cables. A fingerprint lifted from a drinking glass in the living room matched Foster's print.

In addition to blood by the door leading into the backyard, there was blood on items in the backyard. Blood swabs taken from a neighbor's fence, backyard gate, and metal pole all contained Foster's DNA "by way of a single source DNA profile or a major profile." Bradley and Foster could not be excluded as contributors to blood found on a knife recovered from the backyard.

4

The blood trail through Bradley's backyard led to a house down from Bradley's, where a cordless drill covered in blood was found in the yard. The trail continued and led to a picket fence along the street, where officers discovered more blood. There was also blood near the sidewalk. A single-source DNA profile extracted from the blood on the drill, fence, and sidewalk matched Foster's profile.

Soon after the fire, law enforcement discovered Foster's silver Ford truck parked in front of a boat launch along the Mississippi River at Hidden Falls Park. There was blood throughout the truck's interior and on its tailgate. Officers observed a bloody knife inside the truck and blood-soaked underwear on the beach. Law enforcement's efforts to locate Foster were unsuccessful.

A woman testified that law enforcement called her and told her that Foster was assumed to be a missing person. She said that Foster had called her and told her that he was at Twin Town Treatment. The woman testified that Foster told her "not to say anything" to the police about his location. She stated that Foster said that he wanted to speak to the police but was waiting to get himself into treatment. Law enforcement ultimately located Foster at Twin Town. When they arrested him, he had injuries on his hands, including a deep, straight cut on his left palm. And Foster was wearing a watch with dried blood on it. Foster's and Bradley's DNA could not be excluded from a DNA mixture found on Foster's watch.

Foster testified that he was at Bradley's house at the time of the murder but that he did not kill Bradley. He testified that the day before the fire he entered Bradley's house with RJ. He stated that when they left Bradley's house that day, he drove RJ around in

5

exchange for drugs. Foster testified that, on the morning of the fire, Bradley, RJ, and Foster were at Bradley's house. Foster claimed that RJ and Bradley "got into a heated argument" early that morning. Foster explained that Bradley was angry because RJ was selling drugs out of his house. They remained at the house for a short time after the argument. Foster testified that the surveillance footage showed him leaving the house at 7:40 a.m. Foster testified that RJ left the house with him.

Foster testified that he planned to return to Bradley's house that evening to smoke crack with Bradley. He testified that he arrived at Bradley's house that evening, Bradley met him at the door, and Foster asked him if he wanted to smoke. Foster went back to his truck to retrieve the drugs and pipe, returned to Bradley's house, and entered through the front door. Foster testified that he and Bradley were the only people in the house at this time and that they smoked crack together in the living room.

Foster testified that RJ appeared at the rear door to Bradley's house, that he was angry, that he asked Bradley where his crack was, and that RJ and Bradley went upstairs. Foster testified that he thought about leaving but "didn't want [RJ] to think [he] was running off with his dope." Foster claimed that he heard someone yell, saw Bradley tumble down the stairs, and saw blood going down Bradley's face. Foster testified that he went to help Bradley, Bradley fell into him, and RJ started to come down the stairs. Foster claimed that RJ attacked him and Bradley. Foster testified that he started "picking up stuff and [] throwing [it] at [RJ]." Foster testified that RJ attacked him with a knife and that he received a defensive wound on his hand. Foster claimed that he ran out the back door, started looking for weapons in case RJ went after him, and then went to the back gate to leave the

6

yard.  He testified that he was "bleeding really bad" when he got into his vehicle.  He further testified that he did not immediately go to a police station because he "was in shock" and afraid of what would happen if RJ found out.

Foster testified that he drove to the boat launch, started to clean himself up, and dropped his keys.  He abandoned his truck because he could not find the keys.  He testified that he went to a hospital, told hospital staff that he had tried to commit suicide, and received care for his injuries.

The jury found Foster guilty of second-degree intentional murder.  The district court sentenced Foster to serve 415 months in prison.

Foster filed a direct appeal and then asked this court to stay the appeal so he could pursue postconviction relief.  This court stayed the appeal and later reinstated it after the postconviction court denied Foster's request for postconviction relief.

**DECISION**

**I.**

Foster contends that the district court violated his constitutional rights to compulsory process, to due process, and to a fair trial by prohibiting him from calling RJ to the stand at trial.

"[E]very criminal defendant has the right to be treated with fundamental fairness and afforded a meaningful opportunity to present a complete defense." *State v. Richards*, 495 N.W.2d 187, 191 (Minn. 1992) (quotation omitted); *see also* U.S. Const. amend. XIV; Minn. Const. art. I, § 7.  "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

However, when exercising that right, a defendant—like the state—"must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id.* Thus, a defendant's right to present a complete defense is not absolute. *State v. Hannon*, 703 N.W.2d 498, 506 (Minn. 2005).

"Evidentiary rulings rest within the sound discretion of the district court, and we will not reverse an evidentiary ruling absent a clear abuse of discretion." *State v. Ali*, 855 N.W.2d 235, 249 (Minn. 2014). "[E]ven when a defendant alleges that his constitutional rights were violated, evidentiary questions are reviewed for abuse of discretion." *State v. Profit*, 591 N.W.2d 451, 463 (Minn. 1999) (stating rule in the context of an evidentiary challenge based on the constitutional right to present a defense). "A district court abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." *State v. Hallmark*, 927 N.W.2d 281, 291 (Minn. 2019) (quotation omitted).

*Invocation of the Fifth Amendment*

The Fifth Amendment to the United States Constitution provides that no person shall be compelled in any criminal case to be a witness against himself. In denying Foster's request to call RJ to the witness stand, the district court reasoned that "the law is pretty clear that there isn't any evidentiary value from someone invoking the Fifth [Amendment]" and that "all [of] the things" on which the defense wanted to rely to show that RJ killed Bradley were still available to the defense. Although the district court did not expressly rule on Foster's request that the district court alternatively instruct the jury that RJ was unavailable to testify due to his invocation of the Fifth Amendment, the district court

8

implicitly denied this request when it did not make an express ruling and provided no jury instruction. *See Palladium Holdings, LLC v. Zuni Mortg. Loan Tr. 2006-OA1*, 775 N.W.2d 168, 177-78 (Minn. App. 2009) ("Appellate courts cannot assume a district court erred by failing to address a motion, and silence on a motion is therefore treated as an implicit denial of the motion."), *rev. denied* (Minn. Jan. 27, 2010).

Foster argues that "[n]o binding authority authorized the district court to prohibit Foster" from calling RJ to the witness stand. He asserts that neither the Minnesota Supreme Court nor this court "has considered whether a district court may prohibit a defendant from calling a witness when that witness will likely invoke the Fifth Amendment privilege." Foster also asserts that "[c]ourts around the country are split on whether a defendant is prohibited from calling to the witness stand a witness who will invoke his privilege against self-incrimination," and that we should follow the lead of states, such as West Virginia and Maryland, which allow witnesses to be called for that purpose. *See State v. Herbert*, 767 S.E.2d 471, 479 (W. Va. 2014) (stating that "in a criminal trial, when a non-party witness intends to invoke the constitutional privilege against self-incrimination, the trial court shall require the witness to invoke the privilege in the presence of the jury"); *Gray v. State*, 796 A.2d 697, 714, 717 (Md. 2002) (adopting a test used to determine whether a defendant may call a witness to the stand to invoke the Fifth Amendment in the presence of the jury).

Our research shows that both of Minnesota's appellate courts have concluded that a witness's Fifth Amendment right against self-incrimination "takes precedence" over a defendant's Sixth Amendment right to compulsory process. *State v. Moose*, 266 N.W.2d

521, 525 (Minn. 1978); *see State v. Carpenter*, 893 N.W.2d 380, 389 (Minn. App. 2017); *see also* U.S. Const. amend. VI (providing that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor"). *Moose* and *Carpenter* each involved a defendant's attempt to call an alleged alternative perpetrator or accomplice to the witness stand at trial and the district court's refusal to allow the defense to do so based on the witness's Fifth Amendment right against self-incrimination. *See Moose*, 266 N.W.2d at 524; *Carpenter*, 893 N.W.2d at 389.

In *Moose*, the defense informed the district court that the defendant did not wish to take the stand in his own defense, but he wanted to call his brother to testify on his behalf. 266 N.W.2d at 522. The brother may have been in the area where the charged aggravated robbery and assault had occurred, and he apparently resembled the defendant. *Id.* During a chambers conference after the state rested, the brother's attorney indicated that he had instructed his client "to plead the Fifth Amendment in response to any question other than his name." *Id.* The defendant's counsel therefore sought permission to put "[the brother] or his picture before the jury as demonstrative evidence, apparently to cast doubt on the identification made by the state's witnesses." *Id.* The district court denied that request, reasoning that the brother's "mere presence before the jury would *lack probative value* since he would claim his privilege against self-incrimination." *Id.* (emphasis added). The defendant asserted that his brother told the defendant that he would not assert his Fifth Amendment right. *Id.* But defense counsel informed the district court that the brother's counsel had indicated that the brother would assert that right and that he therefore believed that "the rules of ethics did not permit him to call [the brother] as a defense witness." *Id.*

10

On appeal, Moose argued that his attorney's decision not to call his brother to the stand violated his right to compulsory process and to effective assistance of counsel. *Id.* The supreme court rejected that argument, referred to the ABA Project on Standards for Crim. Just., Standards Relating to the Prosecution Function and the Def. Function § 7.6(c) (Approved Draft, 1971) (ABA Standards), and said: "A lawyer should not call a witness who he knows will claim a valid privilege not to testify, for the purpose of impressing upon the jury the fact of the claim of privilege. In some instances, as defined in the Code of Responsibility, doing so will constitute unprofessional conduct." *Id.* at 524-25. The supreme court also noted that the commentary to section 7.6(c) stated:

> Although the situation arises more frequently for the prosecutor than it does for defense counsel, *it is equally unprofessional for either to call a witness he knows will assert a claim of privilege in order to encourage the jury to draw inferences from the fact that the witness claims a privilege*. If there is genuine doubt whether the witness will claim the privilege or whether the validity of the privilege will be recognized, the matter should be resolved out of the presence of the jury.

*Id.* at 525 n.2 (emphasis added and omitted).

The *Moore* court stated that its "analysis [began] from the *well-settled rule* that a valid claim of the privilege against self-incrimination under the Fifth Amendment takes precedence over the Sixth Amendment right to compulsory process." *Id.* (emphasis added). The supreme court also stated that the district court has broad discretion in deciding whether a witness's claim of the privilege is valid and that "[t]he court should not require the witness to prove the hazard of incrimination" in the way a claim is normally proved in court, "otherwise the witness would be compelled to surrender the very protection which

the privilege is designed to guarantee." *Id.* We understand the supreme court to mean that a third-party witness cannot be compelled to take the stand to establish or explain his intent to invoke his privilege against self-incrimination.

The supreme court concluded that under the circumstances, the brother's "privilege against self-incrimination took precedence over [the] defendant's right to compulsory process, and defense counsel's decision not to call [the brother] was consistent with his ethical obligations." *Id.* In sum, the supreme court has spoken on the issue of whether a defendant may call a witness to the stand if the defendant knows that the witness will validly invoke his Fifth Amendment right against self-incrimination: a defendant may not do so. *See id.*

Subsequently, this court relied on *Moose* when deciding, in *Carpenter*, whether the district court abused its discretion by precluding the testimony of a defense witness without first "making an adequate determination as to whether [the witness] would validly invoke his privilege against self-incrimination." 893 N.W.2d at 388. This court quoted *Moose*, 266 N.W.2d at 525, and stated, "district courts are obligated to decide whether a claim of privilege against self-incrimination is valid" and that "in making this decision, a district court is afforded 'broad discretion.'" *Id.* at 389. We held that because the defense witness "wholly and unequivocally invoked his right against self-incrimination, *and because the district court is not required to compel a witness to take the stand after proper invocation*," the district court did not abuse its discretion "by refusing to order [the defense witness to] take the stand." *Id.* (emphasis added).

12

Foster acknowledges that caselaw generally prohibits the state from calling a witness to the stand to invoke the Fifth Amendment right against self-incrimination. *See State v. Mitchell*, 130 N.W.2d 128, 130 (Minn. 1964) (stating that "calling as a witness a coconspirator who did not intend to testify for the prosecution and obtaining from him the claim of privilege against incrimination in the presence of the jury is prejudicial misconduct"). But Foster asserts that "[i]t is wrong to have the same rule for prosecutors and defendants because they are legally different in every relevant way." Foster argues that "allowing a defendant to call an invoking witness to the stand is the better rule because it protects the witness's and the defendant's constitutional rights."

Although it does not appear that the supreme court has considered the specific arguments that Foster makes in this case as support for his proposed rule, that rule is inconsistent with the supreme court's reasoning in *Moose*—as well as the majority of foreign jurisdictions—that doing so has no probative value and invites a jury to engage in impermissible speculation regarding the reason for the invocation of the privilege against self-incrimination.[1] *See Bowles v. United States*, 439 F.2d 536, 542 (D.C. Cir. 1970)

---

[1] The state asserts that the following courts do not allow a witness to be called to the stand for the purpose of invoking the privilege against self-incrimination because such an invocation has no probative value. *See State v. Hughes*, 493 S.E.2d 821, 822-24 (S.C. 1997); *State v. Berry*, 324 So. 2d 822, 829-30 (La. 1975); *State v. Nunez*, 506 A.2d 1295, 1297-99 (N.J. Super. Ct. App. Div. 1986); *Commonwealth v. Greene*, 285 A.2d 865, 866-67 (Pa. 1971); *Commonwealth v. Pritchard*, 411 A.2d 810, 814 (Pa. Super. Ct. 1979); *Bridge v. State*, 726 S.W.2d 558, 567 (Tex. Crim. App. 1986); *State v. Eichstedt*, 567 A.2d 1237, 1240 (Conn. App. Ct. 1989); *Apfel v. State*, 429 So. 2d 85, 86-87 (Fla. Dist. Ct. App. 1983); *State v. Lashley*, 664 P.2d 1358, 1365 (Kan. 1983); *Clayton v. Commonwealth*, 786 S.W.2d 866, 868 (Ky. 1990); *State v. Gerard*, 685 So. 2d 253, 259 (La. Ct. App. 1996); *Commonwealth v. Gagnon*, 557 N.E.2d 728, 736 (Mass. 1990); *People v. Dyer*, 390 N.W.2d 645, 650-51 (Mich. 1986); *People v. Cvetich*, 391 N.E.2d 1101, 1105 (Ill. App. Ct. 1979); *State v. Heft*, 517 N.W.2d 494, 501 (Wis. 1994); *Hamm*

(explaining "that a witness should not be put on the stand for the purpose of having him exercise his privilege before the jury" because that "would only invite the jury to make an improper inference"). Foster cites only one foreign jurisdiction that mandates the rule he proposes: West Virginia. *See Herbert*, 767 S.E.2d at 479. We therefore conclude that the district court did not abuse its discretion by refusing to compel RJ to take the stand for the purpose of invoking his right against self-incrimination in front of the jury.

*Jury Instruction Regarding Invocation*

Foster asserts that "[a]t a minimum the court should have instructed the jury . . . that [RJ] was unavailable as a witness because he invoked his Fifth Amendment right." Foster argues that this court should rely on a single, nonprecedential case from Maryland, *Gray*, 796 A.2d at 717-18, in which the Maryland appellate court stated that a district court "should give a full instruction to the jury, that the witness, under the circumstances described . . . , has invoked his right against self-incrimination, and, therefore, is unavailable to the defendant." But Foster does not provide legal analysis supporting that assertion or otherwise explain why this court should apply the reasoning in *Gray*.

"An assignment of error based on mere assertion and not supported by legal authority or argument is waived unless prejudicial error is obvious on mere inspection." *Brooks v. State*, 897 N.W.2d 811, 818 (Minn. App. 2017), *rev. denied* (Minn. Aug. 8, 2017). Moreover, issues not adequately briefed are waived. *State v. Butcher*, 563 N.W.2d

---

*v. State*, 782 S.W.2d 577, 580 (Ark. 1990); *State v. Polsky*, 482 P.2d 257, 265 (N.M. Ct. App. 1971); *Martin v. United States*, 756 A.2d 901, 904 (D.C. 2000); *United States v. Crawford*, 707 F.2d 447, 449 (10th Cir. 1983); *United States v. Licavoli*, 604 F.2d 613, 624 (9th Cir. 1979); *United States v. Duran*, 884 F. Supp. 573, 575 (D.D.C. 1995).

776, 780 (Minn. App. 1997), *rev. denied* (Minn. Aug. 5, 1997). Because Foster does not provide persuasive legal authority, argument, or adequate briefing in support of his assertion that the district court erred by declining to provide his requested jury instruction, this issue is waived.

*Compelled Appearance for Identification Purposes*

At oral argument to this court, Foster emphasized that the district court should have compelled RJ to appear in the courtroom solely for non-testimonial purposes, that is, for the purpose of allowing the jury to view him so that it could compare RJ's physical characteristics to the evidence regarding RJ's presence at Bradley's home. In district court, Foster argued that he had a right to compel RJ to appear in front of the jury "to have them see him physically" and to "see if he matches the descriptions of numerous individuals" who stated that RJ was at the victim's house. The state objected, asserting that no authority supported the use of a subpoena for that purpose and that it would be "highly irregular" to compel RJ's appearance in the courtroom in front of the jury solely for the purpose of allowing the jury to see him. The district court denied Foster's motion.

Foster subsequently moved the district court to reconsider its determination. At a hearing on the issue, Foster argued that he planned to call RJ to the stand for identification purposes to show the jury RJ's height, complexion, and appearance, and also show them [his] very distinct gait." In sum, Foster argued that there was a "non-testimonial" basis for RJ's presence before the jury should the state "undermine or question or attack the veracity of the identification of him[.]"

15

In response, the district court noted that it understood "there may be some scenarios where there's a videotape . . . and the identity of that individual is important. It stated:

> If it becomes relevant, I get that even if he's not going to say anything, if you need to tie [RJ] to that place and that day and there's a video that has him there, *it may be just his appearance itself is relevant*. I'm not saying it is yet; I'm not saying it's not yet. *We have to see how everything plays out.*

(Emphasis added.)

The district court did not readdress Foster's request to compel RJ's presence for identification purposes. However, Foster admitted photographs of RJ as exhibits at trial. At oral argument to this court, Foster argued that the admission of the photographs of RJ was inadequate and that the jury should have been allowed to see RJ walking in the courtroom so it could have compared his gait to the individuals shown entering and exiting Bradley's house on the surveillance video. Foster's briefing on this issue generally argues that his federal and state constitutional rights to compulsory process guaranteed him "the ability to call [RJ] as a witness, to compel his attendance 'at trial,' and to 'present' him as a witness in his defense, 'put[ting] before the jury' evidence to influence the determination of guilt." Foster asserts that "[t]his right was violated when the district court prohibited Foster from calling [RJ] in front of the jury."[2]

---

[2] We are not certain that this issue is properly before us. The district court does not appear to have ruled on Foster's request to call RJ as a witness solely for the purpose of allowing the jury to observe his "gait." When the issue was first raised, the district court did not rule and instead said it would have to "see how everything plays out." There is no indication that Foster later attempted to call RJ for that purpose or asked the district court to rule on the issue. An issue is not properly before us for review if the district court did not rule on it. *See State v. Reed*, 737 N.W.2d 572, 589 (Minn. 2007) ("Reed cannot challenge the district court's ruling on the admissibility of the conviction, as the court made no such

16

Foster does not cite authority for the proposition that a defendant can compel the attendance of a third party to appear at trial for the sole purpose of allowing the jury to view him in the courtroom. And our independent research does not reveal authority expressly addressing that issue. On one hand, the supreme court has said that the Fifth Amendment "privilege is a bar against compelling communications or testimony" and that "making a suspect or accused the source of real or physical evidence does not violate it." *See State v. Heinonen*, 909 N.W.2d 584, 593-94 (Minn. 2018) (quotation omitted) (stating that "providing a DNA sample was not an incriminating testimonial communication that triggered the Fifth Amendment privilege against self-incrimination").

On the other hand, the Minnesota Rules of Criminal Procedure do not expressly authorize such a process. For example, Minn. R. Crim. P. 22.01, subd. 1, states that a subpoena may be issued for the attendance of a witness at a trial and that "[t]he subpoena must command attendance *and testimony* at the time and place specified." (Emphasis added.) A subpoena may also "command a person to produce books, papers, documents, or other designated objects." Minn. R. Crim. P. 22.01, subd. 2(a). But the rule governing subpoenas does not authorize a subpoena commanding the presence of a third party at trial, solely for the purpose of allowing the jury to view the third party.

Moreover, although the rules of criminal procedure provide for "jury views," the relevant rule states that the district court "may allow the jury to view a *place* relevant to a

ruling."). Nonetheless, because the district court initially denied the request to call RJ solely for identification purposes, and Foster's "gait" argument relates to that purpose, we will consider the issue.

17

case at any time before closing arguments if doing so would be helpful to the jury in deciding a material factual issue." Minn. R. Crim. P. 26.03, subd. 11 (emphasis added). That rule does not authorize the court to allow the jury to view a *person* relevant to a case. *Id.*

In addition, although the rules of criminal procedure authorize the district court—on a defendant's motion and for good cause—to "require the prosecutor to permit the defendant to participate in a lineup, to speak for identification by witnesses, or to participate in other procedures," the relevant rule is limited to the *defendant's* participation in such procedures. Minn. R. Crim. P. 9.01, subd. 2(2). Similarly, Minn. R. Crim. P. 9.02, subd. 2(1), authorizes the district court—subject to constitutional limitations—to order a *defendant* to cooperate with discovery procedures that will "materially aid in determining whether the defendant committed the offense charged," including a lineup, voice identification procedures, finger printing, submission to body measurements, provision of bodily materials, provision of a handwriting sample, and submission to a reasonable physical inspection. These discovery rules do not apply to a third party.

Foster does not cite, and we are not aware of, any rule or constitutional precedent allowing a defendant to compel a third party to appear at a criminal trial solely for the purpose of allowing the jury to observe that party's physical characteristics. Indeed, compelling RJ to appear in the courtroom in front of the jury for the purpose of identifying him as the alleged alternative perpetrator and then allowing him to leave without taking the stand likely would have invited the same impermissible speculation that would have resulted from an express invocation of the Fifth Amendment in front of the jury.

18

In sum, whether a defendant has a constitutional right to compel the attendance of a third party at trial solely for the purpose of identifying him as an alleged alternative perpetrator is an issue of first impression in Minnesota. But we need not resolve that issue in this case because a district court's ruling on such an evidentiary issue is within its discretion, despite the question's constitutional context. *See Profit*, 591 N.W.2d at 463 ("[E]ven when a defendant alleges that his constitutional rights were violated, evidentiary questions are reviewed for abuse of discretion.").

Here, the district court acknowledged that calling RJ to the stand as "demonstrative" evidence might be appropriate because "it may be just his appearance itself is relevant." But there is no authority indicating that the district court abused its discretion by effectively refusing to allow Foster to do so, and the district court allowed an alternative method of presenting evidence regarding RJ's appearance at trial (i.e., the photographs of RJ). Given these circumstances, we conclude that in this particular case, the district court did not abuse its discretion by prohibiting Foster from compelling RJ's attendance at trial and that Foster's rights to compulsory process, to due process, and to a fair trial were not violated.

**II.**

Foster contends that he is entitled to a new trial because the state suppressed favorable, material evidence in violation of court orders, the rules of procedure, and its constitutional duty under *Brady v. Maryland*, 373 U.S. 83 (1963). This issue was raised and determined in the postconviction proceedings in district court following this court's stay and remand of this appeal for that purpose. When direct appeals are stayed for

19

postconviction proceedings, as was the case here, the standard of review is the same as a direct appeal. *See State v. Beecroft*, 813 N.W.2d 814, 836 (Minn. 2012).

"The State violates the constitutional guarantees of due process when, whether intentionally or unintentionally, it suppresses 'material evidence favorable to the defendant.'" *Thoresen v. State*, 965 N.W.2d 295, 304 (Minn. 2021) (quoting *Walen v. State*, 777 N.W.2d 213, 216 (Minn. 2010)). A *Brady* violation has three elements:

> (1) the evidence must be favorable to the defendant because it would have been either exculpatory or impeaching;
> (2) the evidence must have been suppressed by the prosecution, intentionally or otherwise; and
> (3) the evidence must be material—in other words, the absence of the evidence must have caused prejudice to the defendant.

*Id.* (quotation omitted). Minnesota Rule of Criminal Procedure 9.01 provides that the state must disclose any "[m]aterial or information in the prosecutor's possession and control that tends to negate or reduce the defendant's guilt." Minn. R. Crim. P. 9.01, subd. 1(6).

"Evidence is material under *Brady* if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Zornes v. State*, 903 N.W.2d 411, 418 (Minn. 2017) (quotations omitted). "A reasonable probability is one that is sufficient to undermine confidence in the outcome." *Id.* (quotations omitted). Evidence is not material under *Brady* if it would have been inadmissible. *See State v. Radke*, 821 N.W.2d 316, 326-27 (Minn. 2012) (stating that the defendant could not demonstrate prejudice stemming from his claimed *Brady* violation because "the evidence in question was not admissible"); *State v. Hathaway*, 379 N.W.2d 498, 506 (Minn. 1985) (finding discovery violation harmless because most of the

20

undisclosed evidence would have been inadmissible).  Because the materiality analysis "involves a mixed issue of fact and law, we review a district court's materiality determination de novo."  *Walen*, 777 N.W.2d at 216.

Foster argues that the state withheld police reports regarding RJ's alleged involvement in criminal activity and that those reports were favorable and material to his case.  The reports were disclosed around August 21, 2020, during jury selection.  Foster argues that the police reports were material because, had the state not suppressed them, "Foster would have sought admission of evidence in the reports, that evidence would have been admissible, and the admitted evidence would have changed the outcome of the trial."  The state responds that none of the information in the police reports would have been admissible at trial, so it could not have been material.  *See Radke*, 821 N.W.2d at 326-27.

The police reports at issue described the following allegations:  (1) RJ's domestic abuse of his ex-girlfriend, (2) RJ's drug dealing, (3) RJ's attempt to enter a stranger's apartment building and his ensuing flight from police on foot, and (4) RJ's failed attempt to work as a confidential informant for approximately one month.  Foster argues that "[t]he bulk of this evidence would have been admissible as reverse-*Spreigl* evidence, a type of alternative-perpetrator evidence."

To introduce reverse-*Spreigl* evidence, the defendant must show that there is clear and convincing evidence that the third party participated in the *Spreigl* incident, that the evidence is relevant and material, and that the probative value of the evidence outweighs its potential for unfair prejudice.  *State v. Johnson*, 568 N.W.2d 426, 433 (Minn. 1997). To be relevant and material, "the *Spreigl* incident must be similar to the charged offense

either in time, location, or modus operandi." *Id.* at 434. "[A] *Spreigl* crime need not be a 'signature' crime provided that it is sufficiently or substantially similar to the crime charged." *Id.* "The greater the similarity between the *Spreigl* incident and the crime charged . . . the greater the likelihood that the *Spreigl* incident is relevant." *Id.*

In a lengthy order, the postconviction court thoroughly analyzed the information in the police reports and concluded that none of it would have been admissible at trial. As to RJ's alleged domestic abuse of his ex-girlfriend, the postconviction court concluded that "there are insufficient similarities between [RJ's] incidents of domestic abuse and the conduct of the murderer" to allow the evidence as reverse-*Spreigl* evidence. The postconviction court reasoned that although "violence was brought to both victims, the violence was of a wholly different type (brutal murder by multiple stabbings [versus] physical assault)."

As to RJ's alleged drug dealing, the postconviction court concluded that this evidence was inadmissible because "the relevance of [RJ's] status as a drug dealer adds very little to help the jury decide who killed [Bradley] . . . and it presents unfair prejudice to the analysis." As to RJ's alleged attempt to enter a stranger's apartment and ensuing flight from the police, the postconviction court concluded that the evidence did not satisfy the modus operandi requirements. The court reasoned that "there is nothing unique or unusual about fleeing from possible legal consequences, whether on foot or in a car" and that "there is nothing unusual about jumping a fence when that is necessary to avoid legal consequences."

Finally, the postconviction court concluded that evidence regarding RJ's alleged work as a confidential informant was not relevant because "four and a half months had passed" between RJ's involvement as a confidential informant and the murder investigation in this case. The court reasoned that no evidence "suggest[ed] there was misconduct or any interest in not investigating [RJ]."

We discern no error in the postconviction court's reasoning. And we conclude, based on our de novo review, that RJ's prior bad acts were inadmissible. The acts alleged in the police reports were not sufficiently similar to the charged crime with respect to time, place, or modus operandi. At best, the police reports showed RJ's propensity to commit crimes, and the reports were not admissible for that purpose. *See* Minn. R. Evid. 404(b) ("Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith."); *State v. Greenleaf*, 591 N.W.2d 488, 504-05 (Minn. 1999) (concluding that exclusion, at murder trial, of "reverse *Spreigl*" evidence of accomplice's conviction for sexual assault was not an abuse of discretion, where the only similarity between murder and assault was the accomplice's propensity to commit crimes). Because the prior bad acts described in the police reports were inadmissible, there is no reasonable probability that a timely disclosure of those reports would have resulted in a different outcome at trial. Thus, the evidence was not material, and Foster's *Brady* challenge fails for that reason.

## III.

Foster contends that he is entitled to a new trial because the state failed to make expert-witness disclosures and because one of the witnesses was not qualified as an expert.

23

The prosecution must disclose trial witnesses and "[t]he results or reports of physical or mental examinations, scientific tests, experiments, or comparisons made that relate to the case." Minn. R. Crim. P. 9.01, subd. 1(1)(a), (4)(a). An expert "who created no results or reports in connection with the case must provide to the prosecutor for disclosure to the defense a written summary of the subject matter of the expert's testimony," as well as "any findings, opinions, or conclusions the expert will give, the basis for them, and the expert's qualifications." Minn. R. Crim. P. 9.01, subd. 1(4)(c). Such summaries "must be disclosed in time to afford counsel the opportunity to make beneficial use of [them]." Minn. R. Crim. P. 9.03, subd. 2(a). Whether a discovery violation occurred is an issue of law that this court reviews de novo. *State v. Palubicki*, 700 N.W.2d 476, 489 (Minn. 2005).

To testify as an expert, the witness must qualify "by knowledge, skill, experience, training, or education." Minn. R. Evid. 702. The sufficiency of an expert's qualifications rests within the sound discretion of the district court. *State v. Moore*, 458 N.W.2d 90, 96 (Minn. 1990).

The state disclosed its intent to call Sergeant Scott Olson as a witness at trial, but it did not disclose that he would testify as an expert. In the middle of trial, the state indicated that Sergeant Olson would testify as an expert on the issue of "knife slippage" (i.e., injury to the hand of a knife user resulting from the knife slipping in that person's hand) and the possibility that slippage caused the injury to Foster's hand. Foster moved to exclude that testimony, arguing that Sergeant Olson was not qualified as an expert and that the state had

24

failed to provide proper notice. The district court ruled that Sergeant Olson could testify as an expert.

Sergeant Olson testified that he is familiar with knife-slip injuries as a result of his experience investigating crimes and his training at the "Southern Police Institute." He testified that he had seen approximately six knife-slip injuries as an investigator and that he had one day of training on knife-slip injuries at the Southern Police Institute, including training on factors that can lead to knife-slip injuries and how those injuries look. He testified that he believed the injury to Foster's hand was caused by a knife slip because "it wasn't deeper on the high end or the low end, it was uniform straight up and down." He noted that, in his experience, injuries caused by a slashing motion are "going to be jagged" and "deeper at the initial impact point." He also testified that when there is a significant amount of blood on the knife handle, "that's when it gets slippery."

Police officers generally may provide expert testimony "concerning subjects that fall within the ambit of their expertise in law enforcement." *State v. Carillo*, 623 N.W.2d 922, 926 (Minn. App. 2001), *rev. denied* (Minn. June 19, 2001). However, we need not determine whether Sergeant Olson was qualified and whether his testimony was timely disclosed because Foster was not prejudiced by Sergeant Olson's limited testimony.

"Generally, without a showing of prejudice to the defendant, the state's violation of a discovery rule will not result in a new trial." *Palubicki*, 700 N.W.2d at 489; *see also State v. Scanlon*, 719 N.W.2d 674, 685 (Minn. 2006) ("Any discovery-related misconduct on the part of the state is harmless beyond a reasonable doubt if the verdict rendered was surely unattributable to the error." (quotation omitted)). Likewise, a defendant claiming

25

that the district court erred in admitting evidence must demonstrate both an abuse of discretion and resulting prejudice. *State v. Stewart*, 643 N.W.2d 281, 292 (Minn. 2002). "An error is harmless if the verdict actually rendered was surely not attributable to the error." *Id.* at 295.

On cross-examination, defense counsel challenged Sergeant Olson's testimony that he believed Foster's hand injury was not a defensive wound. Defense counsel highlighted Sergeant Olson's limited training on the issue, and Sergeant Olson conceded that he was not a defensive-wound expert. Additionally, the state called Dr. Christopher Liverman, an assistant medical examiner and forensic pathologist, who opined that Foster's hand injury was more consistent with a knife slip than a defensive injury. *See State v. Ross*, 451 N.W.2d 231, 236 (Minn. App. 1990) (concluding that admission of unfounded expert testimony was harmless error because a second qualified expert gave similar testimony), *rev. denied* (Minn. Apr. 13, 1990). The defense then called Dr. Andre Loyd, a biomechanic forensic engineer, who countered Dr. Liverman's testimony and opined that Foster's hand injury was more consistent with a defensive wound. On this record, we are satisfied that Foster's conviction was surely not attributable to Sergeant Olson's limited testimony on knife slippage.

The state also called Dr. Leah Schuppener as an expert witness; Dr. Schuppener was the medical examiner who performed Bradley's autopsy. Foster objected to Dr. Schuppener's testimony regarding the potential causes of Bradley's various injuries. As to the potential causes, the defense argued that it had not received a "written report regarding ultimate conclusions and bases for those conclusions." However, the defense

26

acknowledged that it had received a PowerPoint "slide deck" as a proposed exhibit, which contained "a series of pictures of different items that were found in the house," and that one slide showed "wounds and ha[d] a picture of some of the items next to them."

The district court overruled Foster's objection, concluding that Foster was provided with sufficient notice of the "general nature of the expert's testimony." Dr. Schuppener's PowerPoint and autopsy report were submitted into evidence, and Dr. Schuppener testified regarding which of Bradley's injuries were "possibly" caused by particular items recovered from the scene.

Foster argues that he was not provided with sufficient notice that Dr. Schuppener would compare Bradley's injuries to various objects located in the home and offer "conclusions about what objects may have caused which injuries." But as the state argues, the PowerPoint slide "clearly depicts particular objects with arrows directing them towards images of specific wounds." That slide provided adequate notice that Dr. Schuppener would likely testify regarding a causal connection between the particular objects and the indicated wounds.

Regardless, Foster was not prejudiced. On cross-examination, defense counsel challenged Dr. Schuppener's equivocal testimony regarding which objects caused which injuries, and she acknowledged that she was unable "to definitely rule out any item" as a cause of Bradley's injuries. After reviewing the record, we are satisfied that Foster's conviction is surely unattributable to Dr. Schuppener's limited and equivocal testimony regarding which objects "possibly" caused which injuries.

## IV.

Foster argues that he is entitled to a new trial because the prosecutor engaged in misconduct during cross-examination and closing arguments. "The prosecutor is an officer of the court charged with the affirmative obligation to achieve justice and fair adjudication, not merely convictions." *State v. Fields*, 730 N.W.2d 777, 782 (Minn. 2007).

*Cross-examination*

Foster objected to the prosecutor's questions during cross-examination. We review objected-to prosecutorial misconduct under a two-tiered harmless-error test. *State v. Caron*, 218 N.W.2d 197, 200 (Minn. 1974), *abrogated on other grounds by State v. Ramey*, 721 N.W.2d 294, 298-99 (Minn. 2006); *State v. Whitson*, 876 N.W.2d 297, 304 (Minn. 2016); *see also Woodard v. State*, 994 N.W.2d 272, 277 n.2 (Minn. 2023) (indicating that the two-tiered harmless-error test is applicable in cases involving objected-to prosecutorial misconduct). For a claim alleging less-serious misconduct, we consider "whether the misconduct likely played a substantial part in influencing the jury to convict." *Caron*, 218 N.W.2d at 200. For a claim alleging "unusually serious prosecutorial misconduct," we consider "whether the misconduct was harmless beyond a reasonable doubt." *Whitson*, 876 N.W.2d at 304 (quotation omitted). "Prosecutorial misconduct is harmless beyond a reasonable doubt if the jury's verdict was surely unattributable to the misconduct." *Id.* (quotation omitted).

Foster challenges the following exchange, which concerned the timing of Foster's identification of RJ as the alternative perpetrator:

PROSECUTOR:  Okay.  There was a trial setting in May of this year; is that correct?
FOSTER:  Yes, it was set in May.
DEFENSE COUNSEL:  Objection. Relevance.
District Court:  Overruled.

. . . .

PROSECUTOR:  But May was the first time that you gave the name of some other person?
FOSTER:  Yes.
PROSECUTOR:  In the middle of trial here is the first time we learn of [RJ's] phone number; is that correct?
FOSTER:  I don't know.  If you learned it previous, I don't know, but I know that we went over it here, yes.
PROSECUTOR:  You know that both the [s]tate and defense can collect evidence; correct?
FOSTER:  Yes.
DEFENSE COUNSEL:  Objection.  Relevance.
DISTRICT COURT:  Overruled.

. . . .

PROSECUTOR:  You were aware of [RJ's] phone number; correct?
FOSTER:  Correct.
DEFENSE COUNSEL:  Your Honor.  Objection.  Burden shifting.
DISTRICT COURT:  Overruled.

Foster asserts that the first two objected-to questions sought irrelevant evidence.[3]

"Relevant evidence" is any evidence that tends to make more or less probable the existence

of any consequential fact in the case.  Minn. R. Evid. 401.  Here, the prosecutor sought to

elicit testimony concerning the credibility of Foster's alternative-perpetrator claim.

---

[3] An objection must be specific as to the grounds for a challenge to preserve an issue for appeal.  *State v. Rodriguez*, 505 N.W.2d 373, 376 (Minn. App. 1993), *rev. denied* (Minn. Oct. 19, 1993).  We therefore review the prosecutor's questions for relevancy.

29

Specifically, the prosecutor pointed to Foster's late identification of RJ as the alternative-perpetrator to cast doubt on that claim. Given Foster's testimony that RJ killed Bradley, Foster's credibility was highly relevant and the prosecutor's line of questioning challenging it did not constitute misconduct.

Foster also asserts that the prosecutor shifted the burden of proof to him. A prosecutor improperly shifts the burden to the defendant by implying that the defendant has the burden to prove his innocence, and such conduct constitutes prosecutorial misconduct. *State v. McDaniel*, 777 N.W.2d 739, 750 (Minn. 2010). A prosecutor generally may not comment on a defendant's failure to present evidence. *See id.* However, "a prosecutor's comment on the lack of evidence supporting a defense theory does not improperly shift the burden." *Id.*; *see also State v. Race*, 383 N.W.2d 656, 665 (Minn. 1986) ("The prosecutor's remarks concerning the lack of, or paucity of, evidence of vandalism, then, is viewed as not shifting burden to the defense, but rather as challenging one of the defense's rebuttal theories.").

The prosecutor did not comment on the burden of proof, and the prosecutor's questions were not directed at Foster's failure to present evidence. Again, the prosecutor raised the timing of Foster's disclosure of an alternative-perpetrator defense to show that it was not credible. The prosecutor did not engage in misconduct.

*Closing Argument*

Foster did not object to the prosecutor's closing arguments. Unobjected-to claims of prosecutorial misconduct are reviewed under a modified plain-error standard. *State v. Epps*, 964 N.W.2d 419, 423 (Minn. 2021). Under a traditional plain-error analysis, the

defendant must establish (1) an error, (2) that is plain, and (3) that affected the defendant's substantial rights. *Ramey*, 721 N.W.2d at 298-99. An error is plain if it is clear or obvious, and usually this is shown if the error violates caselaw, a rule, or a standard of conduct. *Id.* at 302. If the three plain-error prongs are satisfied, we then determine whether the error should be addressed to ensure fairness and the integrity of the judicial proceedings. *Id.* at 298. Under the modified approach, if a defendant shows the existence of an error that was plain, the burden shifts to the state to show that the plain error did not affect the defendant's substantial rights. *Id.* at 300-02.

Foster challenges the following statements made by the prosecutor during closing argument:

- "[H]e finally came up with a story that [RJ] did it."

- "[H]is ultimate attempt to conceal his involvement by concocting a very implausible story about what happened inside of that house."

- "You or I, if you're falsely accused of something and you're sitting in jail and you're charged with murder, you're going to tell everyone you possibly can we need to find [RJ], this guy did it, I'm not guilty, I'm innocent, we got to find this guy. But this defendant waits eight months before even telling his defense team that [RJ] did it, letting them try to identify the person that he believes is guilty. That is not how an innocent person behaves. That is how a guilty person tries to avoid responsibility."

- "As the defendant sat awaiting trial for eight months he had some time to think. And ultimately with his back against the wall he finally decided to pin the blame on some other random person, came up with [RJ]. A person he knew at least had a minimal connection to . . . Bradley's house. But the problem is he's only presented you with some very shaky evidence of that very minimal connection. . . . But that's the only evidence he's presented of that connection other than his own words. And so in terms of a connection to actually committing this crime, all you have is the word of this desperate man accused of murder."

31

- "And as the defendant has revealed more and more of his fabrication, we have continually followed up, gotten more evidence and disproven those lies."

- "And then I think the part that was most amusing is the part where he described throwing items at [RJ]. He has to say this because he has to explain why his blood was on so many of these items."

- "And so all of those contradictions between the evidence in the defendant's version tell you that he lied in his testimony."

- "When you evaluate the evidence in the case, you'll see that is one of the many lies that the defendant told."

- "And that's where ultimately the defense wants you and needs you to take absurd leaps from evidence that does not corroborate their theory of the case. They need you to not only take that absurd leap about the cell phone records that don't show [RJ] at . . . Bradley's house, they want you to take it about the DNA evidence, and about the gates, and about the video, and about everything else. And they need you to conclude absurd things about every kind of evidence in this case. . . . If it's any one of these things, maybe, maybe you can make an absurd leap like that, but they're asking you to consistently take absurd leaps about everything in this case, and that's totally unreasonable."

Foster argues that the prosecutor plainly erred by impermissibly expressing a personal opinion regarding the defendant's guilt, *State v. Clark*, 296 N.W.2d 359, 371 (Minn. 1980), calling the defendant a liar in closing argument, *see State v. Mayhorn*, 720 N.W.2d 776, 786, 791 (Minn. 2006), shifting the burden of proof to the defendant, *McDaniel*, 777 N.W.2d at 750, commenting on the defendant's failure to call a witness, *McDaniel*, 777 N.W.2d at 750, expressing personal opinions, as indicated by the use of "I"

statements, *State v. Blanche*, 696 N.W.2d 351, 375 (Minn. 2005), and disparaging the defense, *State v. Bailey*, 677 N.W.2d 380, 403 (Minn. 2004).[4]

We are not persuaded by Foster's assertions that the prosecutor plainly erred by calling Foster a liar, *see State v. Matthews*, 779 N.W.2d 543, 552 (Minn. 2010); by shifting the burden of proof to Foster, *see McDaniel*, 777 N.W.2d at 750-51; by commenting on the defense's failure to call a witness, *see Mayhorn*, 720 N.W.2d at 787; or by disparaging the defense, *see Bailey*, 677 N.W.2d at 403-04.

However, the prosecutor clearly crossed the line from permissible to impermissible closing argument by expressing his personal opinion that Foster did not behave like an innocent person. "A prosecutor's use of phrases such as 'I suggest to you' and 'I think' to interject personal opinion into a closing argument is improper." *Blanche*, 696 N.W.2d at 375. "Prosecutors must not interject their personal opinions into a case." *Id.* Thus, the prosecutor here engaged in misconduct by arguing: "You or I, if you're falsely accused of something and you're sitting in jail and you're charged with murder, you're going to tell everyone you possibly can we need to find [RJ], this guy did it, I'm not guilty, I'm innocent, we got to find this guy." The prosecutor doubled down on that approach arguing, "I think the part that was most amusing is the part where [Foster] described throwing items at [RJ]."

---

[4] The state suggests that Foster "opened the door" to the prosecutor's arguments by stating during the defense's closing argument that Foster told the truth. But only the last two of the challenged comments occurred during the state's rebuttal argument. All of the other comments occurred during the state's preliminary closing argument.

Closing arguments need not be "colorless." *Matthews*, 779 N.W.2d at 551 (quotation omitted). But we are unwilling to condone the prosecutor's disregard of clear law prohibiting the expression of personal opinion in closing argument.

Because the prosecutor clearly erred by offering his personal opinion as a basis for the jury to reject Foster's defense, we next consider whether the state has shown that Foster's substantial rights were not affected by the misconduct. *Ramey*, 721 N.W.2d at 300-02. In making that determination, we consider the strength of the evidence against Foster, the pervasiveness of the erroneous conduct, and whether Foster had an opportunity to rebut any improper remarks. *State v. Peltier*, 874 N.W.2d 792, 805-06 (Minn. 2016). When reviewing a prosecutor's closing arguments, we "review the closing argument as a whole." *State v. Cao*, 788 N.W.2d 710, 717 (Minn. 2010); *see also State v. Walsh*, 495 N.W.2d 602, 607 (Minn. 1993) (noting that courts look at the state's closing argument "as a whole, rather than just selective phrases or remarks that may be taken out of context or given undue prominence").

The state argues that the evidence against Foster was "staggering" and "included physical evidence, DNA and fingerprint evidence, surveillance video, cell-phone analysis, and [Foster's] consciousness-of-guilt conduct." The state asserts that the alleged errors were not pervasive "given the length of the closing arguments." The state notes that "[t]he first seven comments identified by [Foster] constitute[d] three paragraphs and four sentences in a closing argument that spanned 46 pages of transcript" and "[t]he last two comments [Foster] identifies are one paragraph and one sentence in a 13-page rebuttal argument." The state also notes that Foster's trial counsel "had an opportunity to give a

34

closing argument after the prosecutor, delivering a closing that itself spanned 55 pages of transcript." Lastly, the state notes that the district court instructed the jury that "the arguments or other remarks made by the attorneys are not evidence."

To be clear: We do not condone the prosecutor's expression of personal opinion regarding Foster's guilt in closing argument. However, we are satisfied that the state has met its burden to show that the prosecutor's injection of his personal opinion regarding Foster's credibility did not affect Foster's substantial rights. As noted by the state, the evidence against Foster was very strong. He admitted that he was present when Bradley was murdered and his DNA was consistent with DNA obtained from blood at several locations at the crime scene. And his efforts to avoid detection after the crime—including failing to truthfully disclose the source of his hand injury when he sought medical care and his later request that a woman not disclose his whereabouts to the police—strongly suggest consciousness of guilt. *See McDaniel*, 777 N.W.2d at 745-47 (upholding admission of consciousness-of-guilt evidence).

Moreover, the prosecutor's improper statements are less forceful when considered in the context of the closing argument as a whole. Finally, Foster had an opportunity to address the improper statements during his closing argument. And, Foster's attorney forcefully argued his alternative-perpetrator defense. For all of these reasons, Foster is not entitled to a new trial.[5]

---

[5] We note that Foster did not once object to the prosecutor's closing argument. Although we will review unobjected-to prosecutorial misconduct, we are not required to grant relief when it occurs. In any plain-error analysis, we may grant relief only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See Pulczinski*

**V.**

Foster contends that even if the errors he has raised do not individually require a new trial, "those same errors—taken cumulatively—warrant a new trial." A defendant may be entitled to a new trial in "rare cases where the errors, when taken cumulatively, have the effect of denying the appellant a fair trial." *State v. Fraga*, 898 N.W.2d 263, 278 (Minn. 2017) (quotation omitted). "When considering a claim of cumulative error, we look to the egregiousness of the errors and the strength of the [s]tate's case." *Id.* "[W]e are more inclined to order a new trial for cumulative errors in very close factual cases." *Id.*

Foster's cumulative-error claim focuses on the district court's exclusion of evidence regarding RJ. He argues that

> the outcome of this trial was irrevocably altered by the elimination of evidence about [RJ]. Foster was prohibited from bringing [RJ] in front of the jury to show that they did not hear from [RJ] because he chose not to testify to avoid incriminating himself. And the state refused to disclose favorable evidence on [RJ], further hiding from the jury the picture of a well-known drug dealer who was habitually violent, had no respect for other's property, and was capable of jumping a fence to flee. These errors built on each other, fully obscuring the jury's understanding of [RJ] and thereby undermining Foster's defense.

Foster further argues that "[t]he combination of these errors with the misconduct is particularly egregious."

---

*v. State*, 972 N.W.2d 347, 356 (Minn. 2022) (stating that "appellate courts have a limited discretionary power to grant relief based on an unobjected-to error"). Thus, the better practice may be to object to any alleged prosecutorial misconduct during trial, so the district court has the opportunity to address it as it occurs.

Foster's cumulative-error claim is based on the assumption that the district court erred by not requiring RJ to invoke the Fifth Amendment in front of the jury, by not requiring RJ to personally appear in front the jury for "demonstrative" purposes, and by determining that information regarding RJ's alleged prior bad acts was not admissible as reverse-*Spreigl* evidence. But the district court did not err in those rulings. Thus, the exclusion of evidence regarding RJ cannot be the basis for relief under the cumulative-error doctrine.

Foster has established only one error in this case: the prosecutor's improper expression of his personal opinion regarding Foster's guilt through the use of "I" statements during closing arguments. We have determined that the prosecutor's conduct does not provide a basis for relief. And we have determined that any error related to the admission of Sergeant Olson's expert testimony was harmless. For the purpose of our cumulative-error analysis, we assume without deciding that the admission of Sergeant Olson's testimony regarding knife slippage was error. As to whether those two errors are egregious, we look to cases in which the supreme court has reversed based on the cumulative-error doctrine.

In *State v. Bustos*, the supreme court determined that the district court erred by precluding defense counsel from arguing that the state failed to prove any alleged prior domestic-abuse incident beyond a reasonable doubt and by providing a broader definition of "domestic abuse" in its jury instruction than set forth in statute. 861 N.W.2d 655, 657, 663 (Minn. 2015). In determining that the errors cumulatively affected Bustos's substantial rights, the supreme court reasoned that "[b]oth errors related to the jury's determination of

the same element: whether Bustos engaged in a past pattern of domestic abuse" and that because the "record does not contain overwhelming evidence of a pattern of domestic abuse and Bustos contested the existence of a pattern of domestic abuse at trial," it is reasonably likely that the errors had a significant effect on the verdict. *Id.* The supreme court emphasized that "[p]rohibiting counsel from arguing that the State has failed in its essential duty to prove a defendant's guilt beyond a reasonable doubt is *no ordinary error.*" *Id.* at 664 (emphasis added).

In *Mayhorn,* the supreme court found numerous errors including (1) admission of evidence regarding an irrelevant phone call, (2) admission of evidence regarding a prior bad act, (3) the prosecutor's comments regarding Mayhorn's credibility, (4) the prosecutor's appeal to the passions of the jury, (5) the prosecutor's comments regarding Mayhorn's failure to call a witness, (6) the prosecutor's intentional misstatement of evidence, (7) the prosecutor's use of a "were they lying" question, (8) the prosecutor's reference to threats not in evidence, (9) the prosecutor's alignment of herself with the jury, (10) the prosecutor's improper attack on Mayhorn's character, (11) the prosecutor's comments regarding Mayhorn's opportunity to tailor his testimony, and (12) the prosecutor's comments regarding the credibility of a witness. 720 N.W.2d at 779.

The supreme court acknowledged that "[t]he state had a strong case against Mayhorn," but emphasized that "even the strongest evidence of guilt does not eliminate a defendant's right to a fair trial." *Id.* at 791. The supreme court explained that because of "the number of errors and the seriousness of some of them," it was "unable to determine whether the jury based its verdict on the admissible evidence and the reasonable inferences

derived therefrom, or on the state's pervasive misconduct and the consideration of evidence that should have been excluded" and that "the cumulative effect of the prosecutorial misconduct and evidentiary errors" therefore denied Mayhorn a fair trial. *Id.* at 792.

In *State v. Strommen,* the supreme court identified three trial errors: (1) the admission of evidence regarding Strommen's prior interactions with police and prior misconduct, including "testimony about [him] kicking in doors and killing someone"; (2) the district court's failure to instruct the jury regarding accomplice testimony; and (3) the prosecutor's misstatements regarding the state's burden of proof and the law of abandonment. 648 N.W.2d at 682, 686-88 (Minn. 2002). The supreme court concluded that the "erroneous admission of testimony relating to Strommen's other bad acts and interaction with the police" substantially affected the verdict and that based on those errors, he did not receive a fair trial. *Id.* at 688. After deciding that a new trial was necessary, the supreme court noted that the district court erred by failing to instruct the jury regarding accomplice testimony and that the prosecutor misstated the state's burden of proof and the law of abandonment. *Id.* at 689-90. The supreme court noted that these additional errors supported its conclusion that the defendant was denied a fair trial. *Id.* at 690.

Unlike the circumstances in *Bustos*, neither of the errors in this case is extraordinary. *See* 861 N.W.2d at 664 (stating that one of the errors was "no ordinary error"). *Mayhorn* is readily distinguishable from this case given the sheer number of errors in that case and the unprecedented prosecutorial misconduct. *See* 720 N.W.2d at 791-92 (describing the prosecutorial misconduct as "pervasive" and "unprecedented"). Finally, the errors in *Strommen* were more egregious than those in this case. The improperly admitted

39

other-crimes evidence in *Strommen* included testimony that Strommen had killed someone. 648 N.W.2d at 686-87. The improperly admitted evidence in this case concerned knife-slippage evidence that was both supported and refuted by two other experts at trial. In sum, the evidentiary errors in this case are not egregious compared to those that have resulted in cumulative-error relief from the supreme court.

As to the strength of the state's case against Foster, this is not a "very close" factual case. *Fraga*, 898 N.W.2d at 278 ("[W]e are more inclined to order a new trial for cumulative errors in very close factual cases."). As described above, the evidence of guilt was substantial. Because the state presented strong evidence of Foster's guilt and the established errors were not egregious, this is not a rare case in which Foster is entitled to a new trial based on cumulative error.

## VI.

Foster submitted a pro se supplemental brief in which he complains that law enforcement failed to analyze bloodstains in certain parts of Bradley's house, that law-enforcement officers engaged in misconduct, that the state's motion at district court was full of "embellishments" meant to discredit Foster, that the state dismissed criminal charges against RJ between the time of the murder and Foster's trial, that RJ's parole was never violated as a result of drug sales, and that he received ineffective assistance of counsel. He also argues that a November 2022 affidavit states that RJ "could have been involved" in the murder.

When considering pro se arguments made on appeal, several principles govern our review. Courts have a duty to reasonably accommodate pro se litigants, so long as there is

no prejudice to the adverse party.  *Kasson State Bank v. Haugen*, 410 N.W.2d 392, 395 (Minn. App. 1987).  "Although some accommodations may be made for pro se litigants, this court has repeatedly emphasized that pro se litigants are generally held to the same standards as attorneys and must comply with court rules."  *Fitzgerald v. Fitzgerald*, 629 N.W.2d 115, 119 (Minn. App. 2001).

"Claims in a pro se supplemental brief that are unsupported by either arguments or citation to legal authority are forfeited."  *State v. Montano*, 956 N.W.2d 643, 650 (Minn. 2021) (quotations omitted).  "Such arguments will not [be] considered unless prejudicial error is obvious on mere inspection."  *Id.* at 650-51.  Further, a party must cite the record in support of factual assertions.  *See* Minn. R. Civ. App. P. 128.02, subd. 1(c) (stating that "[e]ach statement of a material fact shall be accompanied by a reference to the record").  The record on appeal consists of "[t]he documents filed in the [district] court, the exhibits, and the transcript of the proceedings, if any."  Minn. R. Civ. App. P. 110.01.  We will not consider any factual assertions that are beyond the record.  *See Plowman v. Copeland, Buhl & Co.*, 261 N.W.2d 581, 583 (Minn. 1977) (stating that "[i]t is well settled that an appellate court may not base its decision on matters outside the record on appeal").

We have carefully considered Foster's pro se arguments in light of those principles, and we do not discern obvious prejudicial error justifying reversal.  *See State v. Manley*, 664 N.W.2d 275, 289 (Minn. 2003) (summarily rejecting pro-se claims, noting, "we have thoroughly reviewed the record and conclude that those claims have no merit").

Lastly, Foster moved to strike two documents in the state's addendum, as well as any arguments relying on those documents.  We did not rely on those documents or such

41

arguments in reaching our determinations.  We therefore deny Foster's motion to strike as moot.  *See Drewitz v. Motorwerks, Inc.*, 728 N.W.2d 231, 233 n.2 (Minn. 2007) (denying motion to strike as moot because the supreme court did not rely on the contested documents).

**Affirmed; motion denied.**